IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Action No. 1:17-cv-02621-LTB

SCOTT TYLER JONES,

        Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of Social Security,

        Defendant.

---

ORDER

---

Plaintiff Scott Tyler Jones appeals from the Social Security Administration ("SSA") Commissioner's final decision denying his application for disability insurance benefits, filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401–433. Jurisdiction is proper under 42 U.S.C. § 405(g). Oral argument would not materially assist me in the determination of this appeal.

After consideration of the parties' briefs, as well as the administrative record, I AFFIRM the Commissioner's final order.

## I.     STATEMENT OF THE CASE

Plaintiff is a 49 year-old man with a master's degree in counseling and an associate's degree in applied electronic technology. [Administrative Record ("AR") 66, 262, 319] He seeks judicial review of SSA's decision denying his application for disability insurance benefits. Pl.'s Br., ECF No. 13 at 5. Plaintiff filed his application in July 2015 alleging that his disability began in August 2014. [AR 262]

1

The application was initially denied on November 5, 2015. [AR 138] After Plaintiff's request for review, the Administrative Law Judge ("ALJ") conducted an evidentiary hearing and issued a written ruling on July 5, 2016. [AR 62–100, 116–28, 144] In that ruling, the ALJ denied Plaintiff's application on the basis that he was not disabled because, considering his age, education, and work experience, he had acquired skills from past relevant work that were transferrable to jobs that existed in significant numbers in the national economy. [AR 127] After a request to review this decision from Plaintiff, the SSA Appeals Council remanded the case back to the ALJ. [AR 132–35] The ALJ held another hearing and issued a written ruling on April 5, 2017. [AR 9–23, 32–58] The ALJ again found that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform. [AR 22]

The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination, making SSA's denial final for the purpose of judicial review. [AR 1–3]; *see* 20 C.F.R. §404.981. Plaintiff timely filed his Complaint with this court seeking review of SSA's final decision. ECF No. 1.

## II. RELEVANT MEDICAL HISTORY

Plaintiff's claims on appeal relate to his mental health. In September 2013, Plaintiff, living in Arizona, saw Sami Victor, M.D. for a mental health follow up. [AR 522] Dr. Victor explained that Plaintiff had a "past psychiatric history of [traumatic brain injury], mood disorder and anxiety . . . ." [*Id.*] His current problem list included bipolar disorder. [AR 523] Plaintiff had an unremarkable mental

status exam, with Dr. Victor noting that Plaintiff: appeared appropriately dressed; was awake and alert, cooperative, and euthymic; had appropriate affect, speech, thought content, thought process, perception, orientation, memory, and had no judgment impairment. [AR 522–23] Plaintiff denied anxiety and had an improved mood with no stressors noted. [AR 522] Plaintiff was instructed to continue a medication regime that included Cymbalta and Lamictal. [AR 523]

A month later, Plaintiff presented to Timothy Baker, M.D. as depressed, tired, and lacking motivation. [AR 598] Four days later, Plaintiff saw Dr. Victor who noted an unremarkable mental status exam. [AR 525–27] A few weeks later, Plaintiff reported to Dr. Victor increased anxiety and appeared anxious, but otherwise had an unremarkable mental status exam. [AR 528–29] Dr. Victor prescribed Klonopin and added an anxiety disorder to Plaintiff's current problem list. [AR 529–30] Dr. Baker noted Plaintiff was doing better in a follow up after his appointment with Dr. Victor. [AR 593–94]

Dr. Victor did not note anything remarkable in the next appointments in November 2013 and February, June, and September 2014. [AR 532–45] In the September appointment, Dr. Victor noted that Plaintiff lost his job three days prior. [AR 542] In January 2015, Dr. Victor noted that Plaintiff had bouts of anxiety, but was doing well on his medication regimen. [AR 546]

In May, Plaintiff's wife was present with Plaintiff at his appointment with Dr. Victor. [AR 552] His wife reported that Plaintiff had slight paranoid delusions regarding the September 11 attacks and the illuminati. [*Id.*] Dr. Victor increased

3

Plaintiff's dosage of Lamictal and added Seroquel to stabilize his mood. [*Id.*] Dr. Victor noted that Plaintiff was irritable and had paranoid ideation, but otherwise had an unremarkable mental status exam. [AR 554] A few weeks later, Plaintiff returned with his wife and Dr. Victor noted "drastic improvement" with the increased medication and "[l]ess discussion about delusions." [AR 559] Dr. Victor added insomnia to Plaintiff's problem list and noted Plaintiff would begin seeing a therapist. [AR 559–60]

In June, Plaintiff's mental state had degraded as Dr. Victor wrote that Plaintiff had "[c]ontinued delusional thought disorder[,] reported that I was trying to trick him into taking more medications and that I was fooled by them (illuminati)." [AR 565] Dr. Victor continued that it was "[u]nknown if patient is adherent to his medications" and Plaintiff would not allow his wife to administer them. [*Id.*] Dr. Victor noted paranoid ideation and paranoid delusion. [AR 568]

Soon after, Plaintiff was involuntarily taken to a mental hospital. [AR 408, 412] Plaintiff's wife indicated that Plaintiff had threatened suicide in front of their children; had been forcing his children to watch conspiracy videos; had been physical with her and their children; threatened her; believed he saw a ghost in the house; and that she was concerned for her and their children's safety and had been speaking to a divorce lawyer. [AR 412] Plaintiff was nonresponsive and uncooperative with staff. [AR 411–22] Plaintiff was hospitalized for 12 days. [AR 482]

Dennis Michael Hughes, M.D. performed Plaintiff's psychiatric discharge

summary. [AR 482–90] Dr. Hughes noted that Plaintiff's dose of Seroquel was significantly increased, to which Plaintiff responded well "with resolution of psychotic symptoms and significant reduction of manic symptoms within a few days." [AR 482] In his interview, Plaintiff presented as pleasant, cooperative, verbose, circumstantial, and over inclusive and was "near his psychiatric baseline, with no overt manic or psychotic symptoms noted currently." [AR 482–83] The doctor noted that Plaintiff's wife had filed for an order of protection and Plaintiff would be discharged under the care of his mother, brother, and sister-in-law in Colorado. [AR 482–83, 490]

In July, Plaintiff saw Dana Jean Lahaie, MD in Arizona. Dr. Lahaie noted Plaintiff's constricted affect, circumstantial speech, and anxious mood, but otherwise noted Plaintiff's casual appearance, good concentration, denial of delusions and hallucinations, appropriate orientation, fair insight, and fair judgment. [AR 452] She recommended Plaintiff stay on his medication regimen and that he find mental health care in Colorado. [AR 453]

In August, Plaintiff saw Dr. Baker to get refills for medication and for a referral to a new primary doctor in Colorado. Plaintiff noted that he felt "like things are stable" and Dr. Baker noted an unremarkable psychological exam. [AR 578–79] A few weeks later, Plaintiff saw Mitchell J. Janasek, M.D. for a preventative exam, where Dr. Janasek referred Plaintiff to a psychiatrist and noted that Plaintiff had a normal psychiatric exam with appropriate mood and affect. [AR 671–75]

In October, Plaintiff had a consultative exam performed by David A.

5

Fohrman, M.D. [AR 683] Plaintiff noted his level of depression over the last two weeks was an eight and anxiety a nine on a scale of ten. [*Id.*] This was related to his pending divorce and his lack of a job and a home. [*Id.*] He noted that he had recent manic episodes and he saw a "shimmering curtain" at night due to him taking Seroquel. [AR 684] He stated he was not as focused on conspiracy theories as before his hospitalization and that he enjoyed bike riding and working on the model rocket kit his brother purchased for him. [*Id.*] He felt his medication had helped him "for the most part." [*Id.*]

Dr. Fohrman wrote that Plaintiff "was alert and oriented times four. He was overall cooperative for the examination. His mood was subdued, congruent. He had no evidence of audio or visual hallucinations." [AR 686] Plaintiff knew his Social Security number, could recall three of three unrelated words immediately and two of three in five minutes, could spell "world" backwards, and responded appropriately to questions regarding his fund of general information. [*Id.*] Plaintiff had issues performing "serial sevens" where he was to count back from 100 by seven. [*Id.*] Under a section titled "abstract thinking", Dr. Fohrman wrote that Plaintiff "thought the similarity [between] the words apples and bananas was they are both 'well ... an apple is a fruit and a banana is not- I guess they both grow on trees' and the similarity between the words north and west was they are both 'directions.'" [AR 687]

Dr. Fohrman wrote that Plaintiff had

> [P]rominent suspiciousness and "lack of trust" of others (as evidenced by his own statements and difficulty directly answering the abstract

> thinking questions (due to feelings of suspiciousness regarding the "motive" for asking the question) that is not infrequently associated with residual, long term PTSD symptoms. These psychiatric conditions, taken together are associated with marked global impairment in social and occupational functioning.

[*Id.*] In his medical source statement, Dr. Fohrman opined that Plaintiff had

> [M]ild impairment in his capacity to do one or two-step tasks as well as has marked impairment in his ability to due complex tasks and with sustained attention based on clinical history and results of concentration and memory evaluation (above). The claimant appears to have moderate impairment with consistently putting forth effort in work-related activities and the claimant appears to have mild impairment in social interactions, as evidenced by interactions with myself and self-report.

[AR 687–88]

In November, Catherine Corsello, M.D. performed a mental RFC assessment. [AR 110–13] Dr. Corsello reviewed Dr. Fohrman's exam in her evaluation. [AR 110] Dr. Corsello found that Dr. Fohrman's opinion overestimated the severity of Plaintiff's limitations. [AR 113] She found Plaintiff was moderately limited in his ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; and (5) interact appropriately with the general public. [AR 111–12]

A few weeks later, Plaintiff saw therapist Andrea Caggiano. [AR 702–22] Plaintiff stated that his medication was "doing a great job working for him, [his] psychiatrist was fantastic, but [he was] still having trouble with anxiety and

7

occasional panic attacks." [AR 702] Ms. Caggiano noted an unremarkable mental status exam and recommended that Plaintiff attend therapy. [AR 713–20] Plaintiff signed off on a treatment plan. [AR 733]

In May 2016, Pamela McGill, NP performed a psychiatric initial assessment with Plaintiff. In October, Plaintiff noted that his medications had done a good job until he had to evict a homeless person from his home, which was giving him anxiety. [AR 743] His mental status assessment was unremarkable and Ms. McGill noted he was "functioning well in home and community." [AR 744] A month later, Ms. McGill noted that Plaintiff still thought medication was helpful and that he was working on a "ministry for the homeless." [AR 746] Again, his mental status assessment was unremarkable. [AR 747] The final treatment note was from February 2017, where Plaintiff said that his anxiety was "quite bothersome in close personal social situations" and that he planned to play and sing in a spiritual band. [AR 749] Ms. McGill noted an unremarkable mental status assessment. [AR 750]

### III. LEGAL STANDARDS

#### A. SSA's Five-Step Process for Determining Disability

A claimant is "disabled" under Title II of the Social Security Act if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). SSA has established a five-step sequential evaluation for determining whether a claimant is disabled and thus entitled to benefits. 20 C.F.R. § 404.1520.

At step one, SSA asks whether the claimant is presently engaged in "substantial gainful activity." If he is, benefits are denied and the inquiry stops. 20 C.F.R. § 404.1520(b). At step two, SSA asks whether the claimant has a "severe impairment"—that is, an impairment or combination of impairments that "significantly limits [his] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If he does not, benefits are denied and the inquiry stops. If he does, SSA moves on to step three, where it determines whether the claimant's impairments "meet or equal" one of the "listed impairments"—impairments so severe that SSA has determined that a claimant who has them is conclusively disabled without regard to the claimant's age, education, or work experience. 20 C.F.R. § 404.1520(d). If not, SSA goes to step four.

At step four, SSA determines the claimant's residual functional capacity ("RFC")—that is, what he is still able to do despite his impairments—and asks whether the claimant can do any of his "past relevant work" given that RFC. 20 C.F.R. § 404.1520(e). If not, SSA goes to the fifth and final step, where it has the burden of showing that the claimant's RFC allows him to do other work in the national economy in view of his age, education, and work experience. 20 C.F.R. § 404.1520(g).

In contrast with step five, the claimant has "the burden of establishing a prima facie case of disability at steps one through four." *Doyal v. Barnhart,* 331 F.3d 758, 760 (10th Cir. 2003).

### B. Standard of Review

My review concerns only whether SSA's factual findings are supported by

substantial evidence and whether the correct legal standards were applied. *Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015). With regard to the law, reversal may be appropriate when SSA fails to apply proper legal standards. *Hendron v. Colvin*, 767 F.3d 951, 954 (10th Cir. 2014) (quoting *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994)). With regard to the evidence, I must "determine whether the findings of fact . . . are based upon substantial evidence, and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970).

"Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). The record must demonstrate that the ALJ considered all the evidence, but an ALJ is not required to discuss every piece of evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). I examine the record as a whole and may not reweigh the evidence or substitute my judgment for that of the ALJ. *Flaherty v. Astrue*, 515 F.3d at 1070.

## IV. THE ALJ'S RULING

In his ruling, the ALJ followed the five-step analysis outlined *supra*. The ALJ concluded under the first step that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of August 23, 2014. [AR 14] Under step two, the ALJ determined that Plaintiff had the severe impairments of bipolar disorder and PTSD. [*Id.*]

10

The ALJ concluded under step three that the enumerated severe impairments did not meet or medically equal an impairment in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (the "Listing"). [AR 15] The ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels except that he was limited in that he could "understand, remember and carry out the type of instructions that can be learned on the job in no more than 6 months, tolerate occasional public contact and cannot perform production paced work." [AR 17]

The ALJ found that Plaintiff was unable to perform his past relevant work, fulfilling step four. [AR 21] In the fifth and final step, the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform. [AR 22] The ALJ supported his decision based in part by the testimony of the vocational expert and related hypotheticals, and found that Plaintiff could be a laundry worker, floor wax technician, and food preparer. [*Id.*] Thus, the ALJ concluded that Plaintiff was not disabled. [*Id.*]

## V. ISSUES ON APPEAL

In appealing the ALJ's decision, Plaintiff argues that the ALJ erred by improperly weighing opinion evidence and improperly assessing the consistency of Plaintiff's statements.

### A. Weighing opinion evidence

Plaintiff argues that the ALJ improperly disregarded consultative examiner Dr. Fohrman's opinion. ECF No. 13 at 6. Plaintiff claims that Dr. Fohrman's opinion was consistent with medical evidence and Dr. Fohrman's own observations which established Plaintiff's severe psychological impairment. *Id.* at 7. Plaintiff adds that

11

similar considerations necessitated the ALJ to afford less weight to the opinions of Drs. Hughes, Lahaie, and Corsello. *Id.* at 9. Plaintiff argues that if the ALJ would have properly weighed the opinion evidence, Plaintiff would equal the impairment of Listing 12.03. *Id.* at 9–10.

An ALJ must consider every medical opinion and discuss the weight he assigns to the opinion. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012). Specific factors to consider include: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Watkins v. Barnhart*, 350 F.3d 1297, 1300–01 (10th Cir. 2003); 20 C.F.R. § 404.1527(c).

While the ALJ need not explicitly discuss each individual factor, *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007), the ALJ must "give good reasons in the notice of determination or decision for the weight he ultimately assigns the opinion." *Watkins v. Barnhart*, 350 F.3d at 1301.

In his decision, the ALJ accurately recounted Dr. Fohrman's consultative exam, although did not mention Plaintiff's difficulty with serial sevens nor that Plaintiff questioned the motive of Dr. Fohrman's questioning. [AR 20, 683–88] The

12

ALJ stated that

> Dr. Fohrman diagnosed a bipolar disorder and PTSD and concluded that, "These psychiatric conditions, taken together, are associated with marked global impairment in social and occupational functioning" (Ex. 7F, p. 5). However, such a conclusion is not supported by his objective medical signs and findings, which contain an essentially normal mental status exam. Therefore, the Administrative Law Judge gives no weight to this portion of Dr. Fohrman's opinion (20 CFR 404.1527(c)).

[AR 20]

The ALJ gave some weight to Dr. Fohrman's opinion concerning Plaintiff's marked impairment in his ability to do complex tasks, mild impairment in his ability to do one-to-two step tasks, and mild impairment in social interactions. [*Id.*] The ALJ based his weight on the objective medical signs and findings and Plaintiff's statements about his daily activities. [*Id.*] The ALJ rejected the portion of Dr. Fohrman's opinion where he stated that Plaintiff had a "moderate impairment in consistently putting forth effort in work related activities" as it was not based on available evidence. [*Id.*]

I find that the ALJ accurately weighed the medical opinion of Dr. Fohrman. The ALJ was correct to state that the objective findings in the record did not correlate with Dr. Fohrman's findings that Plaintiff had "marked global impairment in social and occupational functioning." [AR 20] It was appropriate for the ALJ to compare Dr. Fohrman's opinion to the objective findings in the record. 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). As recounted *supra*, Plaintiff consistently had unremarkable mental status exams. [*See, e.g.* AR 452, 522–23, 525–29, 532–45, 713–720, 744, 746, 750] Defendant appropriately

argues that the ALJ accurately described the discrepancies between Dr. Fohrman's own observations and Dr. Fohrman's conclusions. Def.'s Br., ECF No. 14 at 12; [AR 20]

For example, the ALJ noted that Plaintiff said his ability to concentrate was "good." [AR 20] Dr. Fohrman wrote in his exam that Plaintiff's

> [A]bility to concentrate is "good[.]" It [is] only difficult because he has so many different things to do. In addition, he reported having the following problems with his memory. "I just forget things. It is hard to get things from my short term memory into my long term memory." "It is probably due to stress and the result of two major head injuries."

[AR 684] Dr. Fohrman then wrote that Plaintiff had a "marked impairment in his ability to [do] complex tasks and with sustained attention based on clinical history and results of concentration and memory evaluation (above)." [AR 687]

Coupled with Plaintiff's moderate performance in the memory and concentration portion of the exam, it is reasonable to see why the ALJ questioned the consistency of Dr. Fohrman's opinion. [AR 20, 686] There exists at least a scintilla of evidence upon which the ALJ based his opinion of Dr. Fohrman. *Newbold v. Colvin*, 718 F.3d 1257, 1266 (10th Cir. 2013) (holding that the ALJ appropriately weighed the doctor's opinion when he found that opinion inconsistent with the doctor's own report); *cf. Razo v. Colvin*, 663 F. App'x 710, 715 (10th Cir. 2016) (holding that the ALJ followed the proper procedure for weighing medical opinions when he found an opinion inconsistent with the other medical opinions and with the evidence as a whole) (unpublished).

Additionally, the ALJ accurately recounted Dr. Corsello's opinion and gave it great weight. [AR 21, 110–13] The ALJ explained that it was "consistent with the

medical evidence as a whole, including the exam findings of Drs. Lahaie and Hughes and with the objective medical signs and findings of Dr. Fohrman." [AR 21] As Defendant points out, the ALJ noted that Drs. Lahaie and Hughes did not give Plaintiff any functional restrictions, and as such they were not considered medical source opinions that the ALJ needed to weigh. 20 C.F.R. § 404.1527(a)(1), (c), (f); *Welch v. Colvin*, 566 F. App'x 691, 693–94 (10th Cir. 2014) (holding that the ALJ was not required to weigh medical opinions where "each physician simply diagnosed [the plaintiff's] impairments and in some cases recommended treatment for them.") (unpublished).

The ALJ appropriately weighed the opinion of Dr. Corsello. The opinions of Drs. Lahaie and Hughes, discussed *supra*, are relied upon by the ALJ to support the weight given to Dr. Corsello's opinion, and indeed closely comport with her opinion. [AR 21] The parts of Dr. Fohrman's opinion upon which the ALJ relied do the same. [*Id.*] Dr. Lahaie did note "constricted affect, circumstantial speech, and anxious mood," but otherwise both doctors noted generally unremarkable mental exams. [AR 452–53, 482–90]

The ALJ was brief in his specific reasoning explaining Dr. Corsello's weight, but the explanations given elsewhere in his opinion were sufficient to justify his conclusion. *Gonzales v. Colvin*, 515 F. App'x 716, 719 (10th Cir. 2013) (affirming the ALJ's decision when he found that the same record evidence undermining one doctor's opinion supported another doctor's opinion, and thus gave greater weight to the latter's opinion) (unpublished); *Endriss v. Astrue,* 506 F. App'x 772, 777 (10th

15

Cir. 2012) ("The ALJ set forth a summary of the relevant objective medical evidence earlier in his decision and he is not required to continue to recite the same evidence again in rejecting [the doctor's] opinion.") (unpublished).

As such, the ALJ properly weighed the doctors' opinions and I do not evaluate what could have been under Listing 12.03. *Oldham v. Astrue*, 509 F.3d at 1257 ("We review only the *sufficiency* of the evidence, not its weight." (emphasis in original)).

### B. Plaintiff's credibility determination

Plaintiff alleges that the ALJ improperly assessed the consistency of Plaintiff's statements as compared to the record. ECF No. 13 at 10. He argues that the ALJ focused on isolated incidents where Plaintiff was having fewer symptoms and did not examine all the evidence in the record. *Id.* at 13.

Credibility determinations are particularly suited to the finder of fact and must be supported by substantial evidence. *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010). "An ALJ must consider such factors as a claimant's daily activities; attempts to find relief; the type, effectiveness and side effects of medication; and factors that precipitate and aggravate the symptoms." *Watts v. Berryhill*, 705 F. App'x 759, 763 (10th Cir. 2017) (citing *Hamlin v. Barnhart*, 365 F.3d 1208, 1220 (10th Cir. 2004) (unpublished).

Under SSR 16-3p, the ALJ should consider objective medical evidence and other evidence including the individual's statements, medical and non-medical sources, and a variety of factors to consider the intensity, persistence, and limiting effects of the claimant's symptoms. 2016 WL 1119029, at *4–7 (Mar. 16, 2016). The ALJ need not recite a formalistic factor-by-factor recitation of the evidence, but

must merely set forth the specific evidence he relies upon in evaluating the claimant's credibility. *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

Here, the ALJ spoke at length of Plaintiff's allegations and analyzed those allegations with the evidence. He noted Plaintiff's daily activities and Plaintiff's testimony regarding his concentration, memory, and social functioning. [AR 18] The ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the ALJ's] decision." [*Id.*]

The ALJ accurately recounted that Plaintiff's mental symptoms, by his own and his doctors' accounts, were adequately treated by medicine. [*Id.*] As I noted, Plaintiff had severe psychological issues that appeared to stabilize when he took medicine. [AR 482–83] It was indeed repeatedly noted that medicine helped him. [*See, e.g.* AR 453, 482, 546, 559, 593–94, 702, 743] The ALJ added that Plaintiff's explanation of his daily activities to Dr. Fohrman indicated that his symptoms were well controlled on his medications. [AR 18]

The ALJ discussed Plaintiff's concentration and attention and found that, along with his performance in Dr. Fohrman's tests, his ability to "keep track of his medications by using a pill box, to make simple meals 3-4 times a week and to do household chores such as laundry, sweeping and mopping" indicated the capacity for unskilled work. [AR 18–19] The ALJ added that Plaintiff "stated that he drives, shops in stores and [was on a] computer and interacts with friends on Facebook[],

17

tasks that require concentration and attention." [AR 19]

The ALJ supported his finding that Plaintiff appeared capable of tolerating occasional social interaction by noting that Plaintiff "spent several hours a day using his computer in fast food restaurants" and interacted occasionally with his family. [*Id.*]

Plaintiff claims that the ALJ merely recited boilerplate explanations of his credibility determination and did not recognize "extensive evidence of [his] delusions, hallucinations, and other severe psychological symptoms." ECF No. 13 at 12–13. However, explained *supra*, "the ALJ properly considered the relevant factors and specifically set forth record evidence relied upon in making his credibility determination." *Watts v. Berryhill*, 705 F. App'x at 764 (the ALJ did not err when he, in relevant part, described inconsistencies between the plaintiff's complaints and her daily activities and her use of psychiatric medicine).

## VI. CONCLUSION

ACCORDINGLY, for the preceding reasons, I AFFIRM the Commissioner's final order.

Dated: December 21, 2018, in Denver, Colorado.

BY THE COURT:

s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE